IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION


KENNETH WEBBER,                                        Case No. 1:11-cv-03032-CL

                    Plaintiff,

                                                       REPORT & RECOMMENDATION

          v.

FIRST STUDENT, INC., a Delaware
Corporation; JONEL TODD; JACKSON
COUNTY SCHOOL DISTRICT 4; and
BEN BERGREEN, individually and in his
official capacity as Superintendent of Jackson
County School District 4,

                    Defendants.
_____

CLARKE, Magistrate Judge.

          This matter comes before the court on motions for summary judgment filed by Jonel

Todd ("Todd") and First Student, Inc. ("First Student") (collectively "First Student Defendants"),

and Jackson County School District 4 ("the District") and District Superintendent Ben Bergreen

("Bergreen") (collectively "District Defendants").  For the reasons stated below, the motions for

summary judgment (#28, 32) should be DENIED, and Webber's second claim for relief should

be DISMISSED.

//

# BACKGROUND

Defendant First Student is a national corporation that provides school bus services in approximately 40 states. (Decl. Jonel Todd Supp. Mot. Summ. J. ("Todd Decl."), Dckt. # 31, ¶ 2).[1]  First Student is under contract with Defendant Jackson County School District 4 ("the District") to provide transportation for students to and from schools operated by the District. (Id., ¶ 3 & Ex. 1).  First Student operates out of a facility located on Culver Road in Talent, Oregon ("Culver Road facility"). (Id., ¶ 4).  First Student employees park their personal vehicles in a designated employee lot at the Culver Road facility each day while working. (Id.).  The Culver Road facility is owned by the District and leased by First Student pursuant to a written lease agreement. (Id., ¶ 5 & Ex. 2).  Defendant Jonel Todd ("Todd") was the manager of First Student's Culver Road facility during the relevant period of time. (Id., ¶¶ 6, 7).

Behind the Culver Road facility is a District-operated building that houses the District's Future Farmers of America ("FFA") program. (Decl. Ben Bergreen Supp. Mot. Summ. J. ("Bergreen Decl."), Dckt. # 35, ¶ 20).  Individuals traveling to the FFA facility must drive into the Culver Road facility and pass the "bus barn." (Id.)  Approximately 20-25 students travel to the Culver Road facility on a weekly basis to use the FFA facility. (Decl. Morgan Smith Supp. Mot. Summ. J. ("Smith Decl."), Dckt. # 34, ¶ 3 & Ex. 2A, Dep. Ben Bergreen ("Bergreen Dep."), Dckt. #34-2, pp. 35).  The road leading to the FFA building is roughly 15 feet from the First Student employee parking lot. (Id., ¶ 2 & Ex. 1A, Dep. Kenneth Webber ("Webber Dep."), Dckt. # 34-1, pp. 44).  The nearest District school is located a mile or two from the Culver Road facility. (Bergreen Dep., Dckt. #34-2, pp. 7).  Defendant Ben Bergreen ("Bergreen") was the District Superintendent during the relevant period of time. (Bergreen Decl., Dckt. # 35, ¶ 1).

---

[1] The court's citations to the record reflect the page numbers generated at the top of a PDF document by the court's Electronic Case Filing system.

First Student's predecessor, Laidlaw, hired plaintiff Kenneth Webber ("Webber") as a bus driver at the Culver Road facility in June 2007. (Decl. Thomas Boardman Opp. Mot. Summ. J. ("Boardman Decl."), Dckt. # 38-2, ¶ 2 & Ex. 1, Dep. Kenneth Webber ("Webber Dep."), Dckt. #38-2, pp. 5). Webber became a First Student employee following First Student's acquisition of Laidlaw. (Todd Decl., Dckt. # 31, ¶ 8). Webber identifies himself as a "redneck." (Webber Dep., Dckt. #38-2, pp. 15). In July 2009, Webber's father gave him a 3 foot by 5 foot Confederate flag emblazoned with the word "Redneck." (Decl. Kenneth Webber Opp. Mot. Summ. J. ("Webber Decl."), Dckt. #38-1, ¶ 2). Webber affixed the flag to an antenna in the bed of his truck, where it has consistently hung since, including while Webber's truck was parked at the Culver Road facility. (Id., ¶¶ 3-4)

Webber parked his truck at the Culver Road facility with the Confederate flag displayed from July 2009 until February 2011 without incident. (Webber Decl., Dckt. 38-1, ¶ 5). On February 22, 2011, Bergreen visited the Culver Road facility and saw the flag. (Todd Decl., Dckt. # 31, ¶ 9). Bergreen informed Todd that he "had some issues" with the flag and "asked her to have the driver – or the person who owns the flag to take it down when they were parked there." (Bergreen Dep., Dckt. # 34-2, pp. 9). Bergreen told Todd that the presence of the flag at the Culver Road facility concerned him because the District had experienced a number of race-related student disputes at District schools in the recent past. (Todd Decl., Dckt. # 31, ¶ 9; Bergreen Decl., Dckt. # 35, ¶ 20 & Exs. 1B-5B). Bergreen told Todd that the flag also violated the District's anti-harassment policy, which prohibits "jokes, stories, pictures or objects that are offensive, tend to alarm, annoy, abuse or demean certain protected individuals and groups" in District schools and facilities. (Todd Decl., Dckt. # 31, ¶ 9; Smith Decl., Dckt. # 34, ¶ 7 & Ex. 6A).

The next day, February 23, Todd met with Webber and informed him that Bergreen had objected to the flag and wanted Webber to remove it from his truck. (Todd Decl., Dckt. # 31, ¶ 10). When Webber refused, Todd stated she would look further into the issue. (Id.; Webber Dep., Dckt. # 34-1, pp.11). Todd then consulted with Van A. Criddle ("Criddle"), a First Student Regional Operations Manager with authority to approve employee discipline. (Id.; Smith Decl., Dckt. # 34, ¶ 4 & Ex. 3A, Dep. Jonel Todd ("Todd Dep."), Dckt. #34-3, p. 21). During this time, the media reported that Bergreen had required First Student to instruct Webber to remove the flag from his truck. (*See* Bergreen Dep., Dckt. # 34-2, pp. 11-12).[2]

On March 1, 2011, Webber asked Todd to see the policy that prohibited the display of his flag. (Supplemental Decl. Jonel Todd Supp. Mot. Summ. J. ("Suppl. Todd Decl."), Dckt. # 43, ¶ 2). Todd then sent the following e-mail to Bergreen:

> Do you have a policy in writing that you can send me on the flag issue? HR tells me if there is a written policy we can get this put to rest. I am tired of arguing with this driver. Thank you.

(Boardman Decl., Dckt. # 38-2, ¶ 6 & Ex. 5). On March 2, Bergreen replied:

> Jonel, Board policy GDMA harassment addresses objects that are offensive and demeaning to protected individuals and groups. The Confederate flag is a symbol of many racist hate groups. The fact that a member of your organization called immediately to complain about my request not to display the flag on school property is disturbing as is the fact I was identified as the person making the request to remove the flag. I would have expected a more professional, proactive and sensitive response from you on the issue.

(Id.).

On March 2, Todd met with Webber a second time. (Webber Dep., Dckt. # 34-1, pp. 25-26). Todd told Webber that she had been contacted by someone about the issue, and that the display of the flag was contrary to company policy. (Id.). When Webber again asked to see the

---

[2] The news reports alleging that First Student fired Webber due to Bergreen's demands are readily available through a simple internet search using the term "Confederate flag" and Bergreen's name.

company policy, Todd told him he could not see it. (Id.). When Webber again refused to take

down his flag, Todd suspended him for one day. (Id.).

That same day, Criddle e-mailed Bergreen:

Ben, I hope that Jonel has contacted you regarding the course of action we are
taking with regard to the flag person. Our HR department directed us to have him
park the truck out of site [sic] until they could discuss the matter. This morning
he was given a direct instruction to remove the flag. He refused to do so. He has
been suspended with the intent to terminate. He has threatened to contact the
local media and inform them that we asked him to remove the flag while on our
property and he refused so we terminated his employment. We intend to take full
responsibility for his termination and not mention the district or the district policy
at all. I apologize for any issues this has caused the District or you and Doug
personally.

(Bergreen Decl., Dckt. # 35, ¶ 19 & Ex. 6B)

The following day, March 3, Todd and Rowdy Bates ("Bates"), First Student's Grants

Pass facility manager, met with Webber. (Webber Dep., Dckt. # 34-1, pp. 30). Todd and Bates

told Webber he could either take down his flag, roll it up or conceal it in some fashion while at

work, or park away from the Culver Road facility. (Id., pp. 32-33). When Webber refused to

comply with any of the three options, Todd suspended him for another three days. (Id., pp. 34-

35; Todd Decl., Dckt. # 31, ¶ 11).

On March 4, Bergreen replied to Criddle:

Van: Reactions to the flag issue appear to be on the decrease. The next time we
get together, it may be worth it to take some time to analyze how to best deal with
difficult issues between our two organizations. I am always looking to profit from
going through difficult situations and the lessons to be learned for next time – if
any. I appreciate your support and speedy responses to my concerns.

(Bergreen Decl., Dckt. # 35, ¶ 19 & Ex. 6B)

On March 8, Todd called Webber for a third formal meeting. (Webber Dep., Dckt. #34-

1, pp. 38). Todd again asked whether Webber was willing to take down his flag. (Id., pp. 41).

When Webber answered in the negative, Todd fired Webber. (Id., pp. 40; Todd. Decl., ¶ 11).

## STANDARD

Summary judgment shall be granted when the record shows that there is no genuine

dispute as to any material of fact and that the moving party is entitled to judgment as a matter of

law. FED. R. CIV. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505

(1986). The moving party has the initial burden of showing that no genuine issue of material fact

exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986); Devereaux v. Abbey,

263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or

determine the truth but may only determine whether there is a genuine issue of fact. Playboy

Enters., Inc. v. Welles, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "'if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"

Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting Anderson, 477

U.S. at 248).

When a properly supported motion for summary judgment is made, the burden shifts to

the opposing party to set forth specific facts showing that there is a genuine issue for trial.

Anderson, 477 U.S. at 250; Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995).

Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for

summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing

party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show

there is a genuine issue for trial. Devereaux, 263 F.3d at 1076. Put another way, summary

judgment should be granted when the nonmoving party fails to offer evidence from which a

reasonable jury could return a verdict in its favor. Anderson, 477 U.S. at 252. In assessing

whether a party has met its burden, the court views the evidence in the light most favorable to the

non-moving party. Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995). When

viewing the evidence at this stage, all justifiable inferences are drawn in favor of the nonmoving

party. Anderson, 477 U.S. at 255; Gibson v. Cnty. of Washoe, 290 F.3d 1175, 1180 (9th Cir.

2002).

## DISCUSSION

Webber's First Amended Complaint (#21) alleges that the District defendants and First

Student defendants acting together to deprive him of his right to freedom of speech and

expression. Webber asserts two claims for relief:  a claim under 42 U.S.C. § 1983 for violation

of his First Amendment rights, and a claim under the Oregon Tort Claims Act ("OTCA"), OR.

REV. STAT. § 30.260-300, for violation of article I, sections 8 of the Oregon Constitution.

## I.    42 U.S.C. § 1983

Webber brings his first claim under 42 U.S.C. § 1983 for violation of his First

Amendment rights.  To state a claim under § 1983, Webber "must allege a violation of his

constitutional rights and show that defendants' actions were taken under color of state law."

Florer v. Congregation Pidyon Shevuyim. N.A., 639 F.3d 916, 921 (9th Cir. 2011), *cert. denied*,

132 S.Ct. 1000 (2012).[3]

### a. Color of State Law

To state a claim for violation of his First Amendment rights under § 1983, Webber must

first show that First Student acted under color of state law.  Franklin v. Fox, 312 F.3d 423, 444

(2002).  The court begins with the presumption that conduct by private actors is not taken under

---

[3] "The Supreme Court has recognized a doctrinal distinction between 'state action' and 'acts under color of state law.'" Florer, 639 F.3d at 924 n. 5.  In general, the "state action" requirement is a tougher standard to bear, for not every act taken "under color of state law" will amount to state action. Id. (*citing* Lugar v. Edmonson Oil Co. Inc., 457 U.S. 922, 935 n. 18, 102 S. Ct. 2744 (1982)).  However, these requirements converge where a plaintiff alleges deprivation of civil rights under the Fourteenth Amendment. Id. (*quoting* Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 n. 8, 119 S.Ct. 977 (1999)).  Accordingly, while First Student's actions must amount to "state action," this court, like other courts in the Ninth Circuit, uses the two terms interchangeably in this opinion. *See* id.

color of state law. Florer, 639 F.3d at 922. Thus, the plaintiff bears the burden of establishing

that a nominally private entity was a state actor. Id. (citing Flagg Bros., Inc. v. Brooks, 436 U.S.

149, 156, 98 S.Ct. 1729 (1978)). The basic question under the color of state law inquiry is

whether the necessary "close nexus" between the state, the private entity, and the challenged

conduct exists. Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 835 (9th Cir. 1999).

The Supreme Court has articulated four tests for determining whether a private entity's

actions amount to state action: (1) public function; (2) compulsion; (3) joint action; and (4)

governmental nexus. Florer. 639 F.3d at 922. (citing Johnson v. Knowles, 113 F.3d 1114, 1118

(9th Cir. 1997)). A plaintiff need only satisfy one of these tests to show that a private entity

acted under color of state law. Lee v. Katz, 276 F.3d 550, 554 (2002) (citing Brentwood Acad.

v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 304, 121 S.Ct 924 (2001)). The extent of

the state involvement in the action presents a question of fact. Lopez v. Dep't of Health Servs.,

939 F.2d 881, 883 (9th Cir. 1991). However, the ultimate determination of whether there is state

action presents a question of law for the court. See Blum v. Yaretsky, 457 U.S. 991, 997, 102

S.Ct. 2777 (1982) (describing "whether there is state action" as one of "several issues of law" for

the court); Han v. Dept of Justice, 824 F.Supp 1480, 1492 (9th Cir. 1993) (evidence insufficient

to show state action as a matter of law); Spreadbury v. Bitterroot Pub. Library, No CV 11-64-M-

DWM-JCL, 2011 WL 4499043, *5-7 (D. Mont. July 21, 2011) (same); Rodriguez v. Smithfield

Packing Co.. Inc., 338 F.3d 348, 354 (4th Cir. 2003) ("[T]he ultimate resolution of whether an

actor was ... functioning under color of law is a question of law for the court." (quoting Goldstein

v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 344 n. 7 (4th Cir. 2000)).

//

//

### 1. Public function test

The public function test requires that the private party performs a public function that has been both traditionally and exclusively governmental. Florer, 639 F.3d at 925. The scope of the public function test is relatively narrow. Flagg Bros, 438 U.S. at 158 ("While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the state.'") (internal quotation omitted); Chasse v. Humphreys, CV-07-189-HU, 2009 WL 3334912, *5 (D. Or. Oct. 13, 2009) (same). The relevant question under the public function test is not simply whether a private entity is serving a "public function," but "whether the function performed has been traditionally the *exclusive* prerogative of the state." Rendell-Baker v. Kohn, 457 U.S. 830, 842, 102 S.Ct. 2764 (1982) (internal citations omitted; emphasis in original); Santiago v. Puerto Rico, 655 F.3d 61, 69 (1st Cir. 2011) ("The public function test has a specific, targeted purpose: it is meant to counteract a state's efforts to evade responsibility by delegating core functions to private parties.").

Webber argues that First Student performs a public function because it provides transportation services for public school students. Although the Ninth Circuit has not specifically addressed the bussing of students, it has held that state-funded educational services provided by a private entity are not the traditional and exclusive prerogative of the state. Caviness v. Horizon Cmty. Learning Ctr., Inc., 590 F.3d 806, 815 (9th Cir. 2010). The defendant in Caviness was a private, non-profit corporation operating a charter school. Id. at 808. Under state law, charter schools were designated as public schools, publicly funded, subject to certain state regulations, and established by contract with a school district, the state board of education, or the state board for charter schools. Id. at 808-9. The Ninth Circuit extended the reasoning of Rendell-Baker to find that where a state elects to provide publicly funded

"alternative learning environments," the state's characterization of the educational service provider as either private or public is not controlling with respect to whether the function performed is traditionally and exclusively the prerogative of the state. Id. at 815-16. Concluding that the provision of educational services "is not a function that is traditionally and exclusively the prerogative of the state," the Ninth Circuit found that the defendant's charter school contract with the state afforded no basis for holding that it acted under color of state law. Id. at 816.

If the provision of educational services is not traditionally and exclusively the prerogative of the state, as both the Supreme Court and Ninth Circuit have held, it is difficult to imagine that the provision of student transportation services could be traditionally and exclusively the prerogative of the state. Both the First and Third Circuit Courts of Appeal have directly confronted this question and answered in the negative, relying in part on Rendell-Baker. Santiago, 655 F.3d at 69-70; Black ex rel. Black v. Indiana Area Sch. Dist., 985 F.2d 707, 710-711 (3d Cir. 1993). The court finds these cases persuasive. As a matter of common sense, student transportation is not exclusively a function of the state. As private schools provide private education, so too do private individuals and entities provide transportation services for public school student; thus, student transportation falls outside the exclusive purview of the state. Accordingly, the court finds that First Student's provision of student transportation services is not a function that is traditionally and exclusively the prerogative of the state, and therefore, as a matter of law, affords no basis for finding that First Student acted under color of state law.

### 2. Compulsion test

The compulsion test asks whether the overt or covert coercive influence or significant encouragement of the state effectively converts a private action into a governmental action. Kirtly v. Rainey, 326 F.3d 1088, 1094 (9th Cir. 2003). The "mere approval of or acquiescence in

the initiatives of a private party is not sufficient to justify holding the state responsible for those initiatives." Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S. Ct. 2777 (1982). Instead, the plaintiff must demonstrate a sufficient link between the challenged action and the state law or policy scheme alleged to be the driving force behind the private party's actions. Knowles, 113 F.3d at 1120. In other words, a plaintiff must "point to any state regulation or custom having the force of law that compelled, coerced, or encouraged the Defendants to discriminate against the [plaintiff]." Id.

The undisputed facts of this case are as follows. Webber hung his flag from his truck, which he parked every work day at the Culver Road facility. Nobody from First Student or the District raised an issue with the flag for over 18 months. On February 22, 2011, Bergreen visited the Culver Road facility, saw Webber's flag, and asked Todd to have the flag taken down. On February 23, Todd told Webber Bergreen objected to the flag and asked Webber to take it down. Webber refused. On March 1, Webber asked Todd for the policy he was supposedly violating. First Student did not have a policy in place addressing the display of symbols such as Webber's flag. On March 1, Todd e-mailed Bergreen and requested a copy of the District's policy. Sometime on or before March 2, the media reported that Bergreen had ordered First Student to have Webber take his flag down. On March 2 at 7:51 a.m., Bergreen provided the District's anti-harassment policy to Todd and expressed his displeasure about the media reports. On March 2 at 3:20 p.m., First Student Regional Operations Manager Criddle e-mailed Bergreen stating that Webber had been "suspended with intent to terminate" and that First Student would assume "full responsibility" for Webber's termination and "not mention the district or the district policy at all." Also on March 2, Todd met with Webber, told him the flag violated First Student policy, refused to provide him with a copy of the policy when he asked for it, and suspended him for one

day when he refused to take his flag down.  On March 3, Todd suspended Webber for three more days for refusing to take his flag down.  On March 4, Bergreen emailed Criddle stating that "[r]eactions to the flag issue appear to be on the decrease," suggested that they spend time "analyz[ing] how to best deal with difficult issues between our two organizations" at their next meeting in order to "profit" from "the lessons to be learned for next time—if any," and thanked him for First Student's "support and speedy responses" to his concerns.  On March 8, Webber was terminated for refusing a third time to take down his flag.

The parties disagree about the significance of these facts.  Webber argues that Bergreen did not simply request that First Student ensure that Webber take down his flag, he demanded it. He points out that First Student is contractually required to "comply in every respect" with all District policies, and that the District may terminate the contract on 30 days notice if First Student fails to do so.  He points out that First Student did not have any policy in place that addressed his flag but jumped to respond to Bergreen's demand, asking for and enforcing the District's anti-harassment policy as its own for the very purpose of forcing Webber to take down his flag, while simultaneously attempting to conceal the fact that it was enforcing a District policy by refusing to provide him with a copy of it.  He argues that Bergreen's March 2 email to Todd shows that Bergreen was angry and embarrassed that the media was reporting on the story and implicitly threatened First Student in such a way that First Student felt it had no option but force Webber to take the flag down or terminate him, or risk losing its contract with the District. He argues that First Student's assertion that it acted independently is subterfuge, pointing to Criddle's placating email to Bergreen stating that First Student had suspended Webber "with intent to terminate," would assume "full responsibility" for that decision, and would avoid any further mention of the District or District policy while it acted to achieve that goal, yet all the

while acting at Bergreen's behest and to enforce the District's policy.  Webber argues that Bergreen did not attempt to dissuade or discourage First Student from acting against Webber using the District's policy, but rather expressed his thanks and appreciation and suggested that the parties analyze the situation for "lessons to be learned for next time."  This, argues Webber, shows the ongoing efforts by the District to shape and control First Student policy to mirror the District's own, thereby allowing the District to act indirectly through First Student, essentially using First Student as a vehicle for imposing the District's will on First Student employees.

The District counters by arguing that there is simply no evidence that the District threatened First Student with any action should First Student fail to ensure the flag was removed. The District focuses on the lack of direct evidence that it caused Webber's termination, arguing that Bergreen merely asked for the flag to be taken down and that all subsequent disciplinary action against Webber was undertaken at First Student's discretion.  It is worth noting that, while the District could not require First Student to fire Webber, it could mandate that Webber could not drive busses for the District. (Todd Decl., Dckt/ #31, ¶ 3 & Ex. 1, pp. 9).  If First Student's only function is to drive busses for the District, such a request might be construed as *de facto* termination, because there would be no work available for Webber at First Student.  Likewise, while First Student argues that it acted alone in imposing the progressive disciplinary actions against Webber and ultimately terminated his employment, the credibility of this argument is undermined by the fact that First Student was aware of Webber's flag for 18 months and took no action against him until Bergreen's demand.

In sum, while there are certain facts which are undisputed, the decision of law to be made by the court necessarily requires that a factfinder make credibility determinations and weigh the evidence and the inferences that may legitimately be drawn from them.  The determination as to

whether Webber has satisfied the compulsion test is therefore not appropriate for determination
on summary judgment.

### 3. Joint action test

The joint action test instructs "courts to examine whether state officials and private
parties have acted in concert in effecting a particular deprivation of constitutional rights."
Franklin, 312 F.3d at 445 (quotation and citation omitted).  A plaintiff may establish joint action
by proving the existence of a conspiracy or by showing that the private party willfully
participated in joint action with the state or its agents.  Id. (*citing* Collins v. Womancare, 878
F.2d 1145, 1154 (9th Cir. 1989)).

Webber does not argue that First Student conspired with the District, and no conspiracy is
readily discernible from the evidence presented.  To prove the existence of a conspiracy under
the joint action test, a plaintiff must prove "an agreement or meeting of the minds to violate
constitutional rights."  Franklin, 312 F.3d at 441.  This requires that the plaintiff specifically
identify the conspiring parties, the shared objective, and the acts committed by each defendant in
furtherance of the conspiracy.  Olsen v. Idaho Bd. of Med., 363 F.3d 916, 919 (9th Cir. 2004);
Harris v. Roderick, 126 F.3d 1189, 1196 (9th Cir. 1997).  "[E]ach participant in a conspiracy
need not know the exact details of the plan, but each participant must at least share the common
objective of the conspiracy."  Id. at 445 (*citing* United Steelworkers of Am. v. Phelps Dodge
Corp., 865 F.2d 1539, 1540-41 (9th Cir. 1989)).  Whether First Student and the District shared a
common objective is debatable.  As pled and argued by Webber, the District's goal was to ensure
that Webber's flag was removed from District property, even if that required that Webber
himself be removed.  On the other hand, First Student's goal was to salvage and maintain its
contractual relationship with the District, even if doing so required First Student to violate

Webber's First Amendment rights.  In other words, Webber's suspension and ultimate

termination were the means to an end, not the end itself—the way in which the District and First

Student achieved their differing goals, not a mutual goal.  Absent a common goal and overt

actions in furtherance of that goal by each of the defendants, there can be no conspiracy between

First Student and the District.

 Whether Webber can show joint action through willful participation is a closer call.  To

show that a private party is a willful participant in joint action with the state or its agents, the

plaintiff must demonstrate that "the state has so far insinuated itself into a position of

interdependence with [the private entity] that it must be recognized as a joint participant in the

challenged activity."  Collins, 878 F.2d at 1154 (citation and quotation omitted).  This occurs

when a state official has substantially cooperated in the unconstitutional act of a private entity,

Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 960 (9th Cir. 2008) (citation omitted),

and the state has knowingly accepted the benefits derived from the unconstitutional behavior,

Kirtley, 326 F.3d at 1093 (citation omitted).  However, a state official's mere acquiescence in the

actions of a private party is not sufficient to show joint action.  *See* Flagg Bros., 436 U.S. at 164.

 Webber argues that First Student's contract with the District essentially converted First

Student into an extension of the District itself by conditioning the contractual relationship on

First Student's compliance with and enforcement of District policies.  Thus, when First Student

did not have a policy that would allow it to demand that he remove his flag, the District provided

and First Student proceeded to enforce a District policy as if it were First Student policy.  Where

the state and private parties act pursuant to a written agreement and actively engage in conduct

leading up to the alleged constitutional violation, the state and the private actor may be found to

have acted jointly.  *Compare* Berger v. Hanlon, 129 F.3d 505, 509-515 (9th Cir. 1997) (finding

willful participation where the parties executed letter of agreement regarding the execution of a criminal search warrant and coordinated on the planning and execution of the search), *vacated and remanded by* 526 U.S. 808, 119 S.Ct. 1706 (1999), *judgment reinstated by* 188 F.3d 1155 (9th Cir. 1999); *with* Brunette v. Humane Soc. Of Ventura Cnty., 294 F.3d 1205, 1212-13 (9th Cir. 2002) (no willful participation where the defendant invited a reporter last minute to the scene of an executed search warrant pursuant to long-standing custom, not a written agreement). Furthermore, while Webber does not contend that the District dictated each successive disciplinary action against him, he argues that the District required First Student to take whatever disciplinary action was necessary in order to remove his flag, up to and including terminating his employment. Thus, he argues, the District used First Student to indirectly violate his First Amendment rights. He argues the District may therefore be found to have willfully participated in his suspension and termination, because it both provided the impetus for the constitutional violation and took no action to dissuade First Student from engaging in the course of action effecting that violation. *But see* Collins, 878 F.2d at 1155-56 (no willful participation where police issued citations to protestors held subject to citizen's arrest by health clinic where police had discouraged the health clinic from detaining protestors and then remained neutral throughout subsequent investigation).

As discussed above in the "Compulsion Test" section of this report, the question of whether and to what extent First Student acted at the District's behest when taking action against Webber is a heavily contested factual issue. Therefore, the determination as to whether the District willfully participated in First Student's actions against Webber – which, if answered in the affirmative, would make the District and First Student joint actors – is not suitable for determination on summary judgment.

### 4. Governmental nexus test [4]

The governmental nexus test asks whether "there is such a close nexus between the State and the challenged action that the seemingly private behavior may be fairly treated as that of the State itself." Kirtley, 326 F.3d at 1094-95 (*quoting* Brentwood, 531 U.S. at 295). Generally, the governmental nexus test requires evidence that the private actor is "entwined with governmental policies, or ... [the] government is entwined in [the private actor's] management or control." Brentwood, 531 U.S. at 295. A showing of mere "significant links" is insufficient to demonstrate a governmental nexus between the state and a private entity without further evidence of "substantial interconnection." Kirtley, 326 F.3d at 109; *see also* Kuba v Sea World, 428 F. App'x, 728, 731–32 (9th Cir. 2011) (theme park's leasing of public property subject to conditions regarding land use and programming did not show sufficient nexus absent further evidence of interconnection). Although the governmental nexus test is the most vague of the four state action tests, the Ninth Circuit has articulated four factors to consider when determining whether entwinement exists: (1) whether the organization is primarily made up of state institutions; (2) whether state officials control the organization's decision making; (3) whether state institutions largely generate the organization's funds; and (4) whether the organization is acting in place of a traditional state actor. Villegas, 541 F.3d at 955 (*citing* Brentwood, 531 U.S. at 295-99).

---

[4] While the joint action and governmental nexus test are routinely treated as separate inquiries, the Ninth Circuit and courts in this District have recognized that the two tests are very similar, and have treated the tests as a singular inquiry at times. See Jensen v. Lane Co., 222 F.3d 570, 574 (9th Cir. 2000) ("Courts have developed various tests for determining whether an individual's actions are 'state action'... The relevant one here is the 'close nexus/joint action' test."); Chasse v. Humphries, No. CV–07–189–HU, 2009 WL 3334912, *6 (D.Or. Oct. 13, 2009) ("[S]ome cases discuss [the joint action and governmental nexus test] together."). *See also* Giulio v. BV CenterCal, LLC, 815 F. Supp. 2d 1162, 1178-79 (D.Or. 2011) ("The discussion of the joint action test is equally applicable to the general nexus test."). While the two tests are similar, the facts of this case are sufficiently nuanced to require that the tests be considered in separate inquiries.

The court has already found, as described above, that First Student is not performing a function that is traditionally and exclusively the province of the state, therefore, the fourth element does not apply here. Webber does not claim, nor does the evidence suggest, that First Student is made up of state institutions; therefore, the first element likewise does not apply. Although it is undisputed that First Student has a contract to perform services for the District, the evidence submitted does not establish the nature and extent to which that contract accounts for First Student's revenues. Therefore, the court is unable to determine the weight that should be afforded the third factor.

With regard to the second element, Webber argues that the inference that the District controls First Student's decision making may be drawn from the terms of the contract between them. The court disagrees. While the contract does afford the District the discretion to require that certain employees not perform work for the District and to terminate the contract should First Student not comply with its terms or District policy, it does not directly empower the District to make decisions regarding the hiring, firing, or discipline of First Student employees. As discussed above, questions of fact exist regarding the nature and the extent to which First Student was compelled, coerced, or encouraged to take certain actions as the result of express or implied pressure by the District. However, the ability to compel or encourage decision making is distinct from the ability to control decision making. The court finds that, as a matter of law, the evidence presented is insufficient to support the conclusion that the District had the ability to control First Student's decision making process. For these reasons, the governmental nexus test affords no basis for holding that First Student acted under color of state law.

//

//

## Conclusion

Because the court finds that material questions of fact exist as to whether First Student was coerced into terminating Webber, and whether First Student and the District were joint actors in Webber's termination, it cannot properly resolve on summary judgment the ultimate legal issue of whether First Student acted under color of state law when it terminated Webber.

### b. Violation of Webber's First Amendment Rights

When the state acts as both a sovereign and an employer, courts utilize the test from Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731 (1968) to determine whether a public employer has violated an employee's constitutional rights.  In the Ninth Circuit, the Pickering test has evolved into a sequential five-step inquiry.  Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009), *cert. denied*, --- U.S. ---, 130 S.Ct. 1047 (2010).  The steps are:

1. Whether the plaintiff spoke on a matter of public concern;
2. Whether the plaintiff spoke as a private citizen or public employee;
3. Whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action;
4. Whether the state had adequate justification for treating the employee differently from members of the general public;
5. Whether the state would have taken the adverse employment action even absent the protected speech.

Id at 1070-72.  A plaintiff's failure to satisfy one of the steps ends the analysis.  Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 961 (9th Cir. 2011).

### 1. Whether Webber spoke on a matter of public concern

An issue of public concern can be speech that relates to "any matter of political, social, or other concern to the community."  Connick v. Meyers, 461 U.S. 138, 146, 103 S.Ct. 1684 (1983).  The Ninth Circuit defines the scope of the public concern doctrine broadly and has "adopted a liberal construction of what an issue of public concern is under the First Amendment."  Clairmont v. Sound Mental Health, 632 F.3d 1091, 1103 (*quoting* Desrochers v.

<u>City of San Bernadino</u>, 572 F.3d 703, 709-10 (9th Cir. 2009)).  To help discern whether a

plaintiff spoke on a matter of public concern, courts review "the content, form, and context of a

given statement, as revealed by the whole record."  <u>Clairmont</u>, 632 F.3d at 1103 (*quoting*

<u>Connick</u>, 461 U.S. at 147-48).  Content is the first and most important factor in the public

concern inquiry. <u>Johnson</u>, 658 F.3d at 965 ("content is king") (*citing* <u>Desrochers</u>, 572 F.3d at

710).  Whether an employee's speech touches on an issue of public concern presents a question

of law. <u>Connick</u>, 461 U.S. at 148.

     The evidence regarding what message, if any, Webber intended to express with his flag

is at best inarticulate and at worst contradictory.  First Student argues that Webber's deposition

testimony unequivocally establishes that he did not intend for his flag to express any public

message:

> **Q**: Do you – other than the fact that you identify as a redneck, why do you fly the flag? I
> mean, are you – what are you trying to do by flying the flag?
>
> **A**: I am not trying to do anything. It was a gift from my father, and I was talking about
> getting it in the past, and he just found it for me. So it is just something I wanted to have
> on my truck.
>
> …
> **Q**: Okay. It is – are you trying to let the people around you who see your truck or see
> you, are you trying to communicate to them that you are a redneck?
>
> **A**: No. It is just my flag.
>
> **Q**: Okay. You are not trying to communicate anything to anybody?
>
> **A**: No.
>
> **Q**: It is just a possession of yours that it important to you?
> **A**: Right.

(Webber Dep., Dckt. # 34-1, pp. 21-22).  Webber responds that defendants take too narrow an

approach to the evidence.  He argues that to him, the Confederate flag represents certain social

and cultural values which he associates with the South and what can be characterized as a "redneck lifestyle." (Id., pp. 13). Those values include the centrality of strong family relationships ("family means everything to you"), living close to the land ("you hunt and fish"), and an aversion to entitlements ("you work for what you have"). (Id., 13-17). He expresses a sense that social and cultural values diverges between the northern and southern states of this nation, and that his Confederate "redneck" flag represents a statement regarding the social and cultural values of the South which is readily identifiable by those who view it. (Id.).

It is true that Webber stated that he did not intend to communicate anything by flying his flag. However, his deposition testimony shows that the flag was important to him as a symbol of the social and cultural values he holds. The flag is large, measuring three feet by five feet, and its placement on Webber's truck was both bold and conspicuous. His actions in refusing to remove or conceal the flag directly contradict the statement that he did not intend the flag to be seen and understood as an expression of those values. Webber tenaciously clung to his right to continue to display the flag in the face of suspension and the threat of termination. Webber's decision to risk losing his job of nearly six years rather than remove his flag speaks volumes about not only the symbolic value it holds for him, it is inconsistent with the conclusion that he did not mean to convey anything to the public by displaying it. In light of this contradictory evidence, the court cannot conclude that Webber did not intend the flag to convey a message to the public at large. The court therefore turns to the question of whether that message touches on a matter of public concern.

Courts have recognized at least three different messages that can be expressed by the Confederate flag. The Confederate flag can be a political symbol for state's rights and a decentralized form of government. Scott v. Sch. Bd. of Alachua Cnty., 324 F.3d 1246, 1248-49

(11th Cir. 2003).  The Confederate flag can also carry racial messages of "white supremacy,

rebellion, segregation, and discrimination."  Coleman v. Miller, 885 F.Supp. 1561, 1569 (N.D.

Ga. 1995), aff'd, 117 F.3d 527 (11th Cir. 1997).  Finally, the Confederate flag can be a symbol of

history and heritage.  See e.g. Dixon v. Coburg Dairy. Inc., 330 F.3d 250, 263-65 (4th Cir. 2003)

vacated on other grounds, 369 F.3d 811 (4th Cir. 2005); Erickson v. City of Topeka, 209

F.Supp.2d 1131, 1135 (D. Kan. 2002).

There is no indication that Webber views his flag as symbolizing state's rights, and he

has unequivocally stated that he is neither politically inclined nor a racist.  (Webber Dep., Dckt.

# 34-1, pp. 18).  Whether he intended the flag to convey a message of history and heritage

presents a close call.  In the cases where the court has found that the Confederate flag conveys a

message of history and heritage entitled to First Amendment protection, the plaintiffs typically

either had Southern lineage, actively participated in Confederate historical causes, or both.  See

Dixon, 330 F.3d at 254 (plaintiff a member of the Sons of Confederate Veterans ("SCV")

educational group); Erickson, 209 F.Supp. at 1135 (same); Carpenter v. City of Tampa, No. 8:03

CV 451 T 17 EAJ,  2005 WL 1463206, *1  (M.D. Fla. June 21, 2005) (same).  In the one case

where it is not clear whether the plaintiff had Southern heritage or was a SCV member, the

plaintiff was able to clearly articulate to the court that his display of the Confederate flag was

related to his interest in history and heritage.  Greer v. City of Warren, No. 1:10–cv–01065, 2012

WL 1014658, * 7 (W.D. Ark. Mar. 23, 2012).

In this case, there is no evidence that Webber is an active participant in any Confederate

organizations, nor has he established that he has a personal Southern heritage.  He does,

however, articulate that his flag represents positive cultural and social values which he associates

with the South and southern living, which are distinctly different from the values which are

important in the North and northern living. He believes that these values are unique to the South,

widely held by people who reside there, and fundamental to the culture of the southern United

States. His description of an agrarian southern culture standing in contrast to an industrialized

northern culture aligns generally with the cultural schism that existed between the North and the

South at the time of the Civil War. Defendants argue that the flag is no more than a

representation of a contemporary lifestyle and has no additional significance. While it is true

that Webber does not wax eloquent about the Civil War or the historical significance of the

Confederate flag, the court notes that he is a man with an eighth grade education, not a scholar or

a historian. On this record and in light of his limited education, a reasonable factfinder could just

as well conclude that Webber's flag is meant to convey a message of pride and association with

the cultural history of the south.

On these facts, the court finds that a genuine question of material fact exists as to whether

Webber intended his flag to convey a message of history and heritage which is entitled to First

Amendment protection. The question of whether Webber's flag touches on a matter of public

concern is therefore not appropriate for determination on summary judgment, and is properly

resolved at trial.

### 2. Whether Webber spoke as a private citizen or public employee

The First Amendment does not protect a public employee's speech when the speech is

part of the employee's professional duties. Clairmont, 632 F.3d at 1105 (citing Garcetti v.

Ceballos, 547 U.S. 410, 426, 126 S.Ct. 1951 (2006). Whether an employee's contested speech

was part of his official duties is a mixed question of fact and law. Id. (citing Posey v. Lake Pend

Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1129 (9th Cir. 2008)). The scope and extent of the

plaintiff's job responsibilities presents a question of fact, while the question of whether the

speech is attributed to the employee as private individual or a public employee is a question of law.  Johnson, 658 F.3d at 954 (*quoting* Eng, 552 F.3d at 1071).

It is undisputed that Webber's job responsibilities were limited to driving a school bus. Webber did not display the flag in the performance of his duties as a bus driver; he left it attached to his personal vehicle, which remained parked in the employee parking lot during the work day.  There is no evidence that he spoke about his flag during the work day or that his flag disrupted the workplace environment at First Student.  In short, Webber's flag represents his personal view on the subject matter it addresses, not the view of either First Student or the District. Although the District has stated it was concerned that students walking past Webber's car in the Culver Road facility would somehow attribute the message it conveyed to First Student or the District itself, there is no evidence that this fear ever materialized, let alone that it materialized so as to cause overt harm to either First Student or the District.  Under nearly identical circumstances, at least one court has found that the plaintiff spoke as a private citizen, not a public employee.  Carpenter, 2005 WL 1463206 at * 3.  This court agrees, and finds that as a matter of law, Webber's speech may only be attributed to him as a private individual.

### 3. Whether Webber's protected speech was a substantial or motivating factor in the adverse employment action

Whether Webber's speech was a substantial or motivating factor in his termination is purely a question of fact and the court assumes the truth of plaintiff's allegations.  Clairmont, 632 F.3d at 1106 (*citing* Eng, 552 F.3d at 1071).  Webber alleges that he was suspended, threatened, and ultimately terminated for refusing to take down his flag.  (Am. Compl., Dckt. # 21, ¶¶ 23-24, 27-28, 30-31).  First Student concedes that Webber was suspended and ultimately terminated for refusing to take down his flag.  Therefore, it is undisputed that Webber's speech, the display of his flag, was a substantial or motivating factor in his termination.

### *4. Whether the state had adequate justification for treating Webber differently from members of the general public*

Under Pickering, the state must establish that it "had an adequate justification for treating the employee differently from any other member of the general public." Clairmont, 632 F.3d at 1106 (*quoting* Garcetti, 547 U.S. at 418). Specifically, "the government must establish that its 'legitimate administrative interests outweigh the employee's First Amendment rights.'" Id. (*quoting* Huppert v. City of Pittsburg, 574 F.3d 696, 701 (9th Cir. 2009)). Such interests can include "promoting efficiency and integrity in the discharge of official duties and maintaining proper discipline in the public service." Id. (*citing* Connick, 461 U.S. at 150-51, 103 S.Ct. 1684). "The employer need not establish that the employee's conduct actually disrupted the workplace – 'reasonable predictions of disruption' are sufficient." Nichols v. Dancer, 657 F.3d 929, 933 (9th Cir. 2011) (*quoting* Brewster v. Bd. Of Educ. of Lynwood Unified Sch. Dist., 149 F.3d 971, 979 (internal citation and quotation marks omitted)). However, a public employer must demonstrate more than the mere "specter of disruption" to show that its prediction of workplace disruption is reasonable. Id. Although Pickering balancing is ultimately an issue of law, its resolution often requires resolving underlying factual disputes. Eng, 552 F.3d at 1071.

Neither the District defendants not the First Student defendants argue that Webber's flag caused disruptions among employees or co-workers within the workplace. Instead, the District argues that it could reasonably predict that Webber's flag would cause disruptions within District schools, based on the fact that students regularly walked past Webber's truck on their way to the FFA building and the history of race-related student disputes in District schools. In support of this argument, the District submits that there was significant racial tension among students within the District high school approximately eight years ago, which the District has successfully managed to abate through the implementation and stringent enforcement of its policy prohibiting

the use or display of symbols by students for the purpose of intimidating or harassing other students, including the Confederate flag. (Bergreen Decl., Dckt. # 35, ¶¶ 5, 17-18). However, isolated instances of student behavior continue to occur. The District offers eight specific student related incidents which occurred between May 16, 2007, and March 3, 2011, (id., ¶¶ 6, 9-11, 13-16), and one more that was "classified" as a "gang behavior" incident because it involved the display of the Confederate flag, (id., ¶ 8). The District also contends that the Confederate flag is used by a white supremacist gang known as the Crazy White Boys, and that the District has in the past had "several" students known to identify with that gang who used the Confederate flag as a racially divisive symbol. (Id., ¶¶ 7, 10-12, 15). First Student adopts the District's argument as its own.

This evidence is sufficient to show that the District has had problems with racial tension and gang activity in its schools, and that these problems predate Webber's employment and continued after his termination. However, there is no evidence that the students involved in these activities were among those visiting the FFA building, or, if they were, that the students saw Webber's flag and reacted to it by engaging in race intolerant behavior. Nor is there any evidence that any student complained about Webber's flag. In fact, despite the District's apprehension, there is simply no evidence that any District student ever saw Webber's flag during the 18 months that it was displayed on his truck while it was parked at the Culver Road facility, or his flag in any way affected or influenced student behavior in any way. As for First Student, there is simply no evidence that any of its employees reacted in any way to Webber's flag. While the Ninth Circuit has traditionally given public employers significant leeway to regulate public employee speech, it has "never given public employers carte blanche to retaliate against employees whose conduct does not reasonably threaten to disrupt operations." Nichols,

657 F.3d at 933.  On the record before the court, there is simply no evidence to support the

conclusion that Webber's flag threatened either the District's or First Student's operations.

The District argues that this element should be evaluated under the standard articulated in

Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733

(1969).  Tinker sets forth the standard under which the First Amendment rights of students in

public schools are evaluated.  The District argues that this standard should apply because of the

proximity of the Culver Road facility to the FFA building and the fact that students regularly

walked by Webber's parked truck on their way to the FFA building.  This argument lacks merit.

The Ninth Circuit recently re-affirmed that the Tinker standard only applies to the in-school

speech of *students*.  Poway Unified, 658 F.3d at 963 (Pickering balancing test the correct

standard by which to measure the in-school speech of a teacher).  Here, Webber is not a student

and the speech at issue did not occur in-school, it occurred in the parking lot of a facility more

than a mile away from the nearest school.  Tinker therefore simply does not apply.

Although not well-articulated, First Student appears to argue that the court should apply a

forum based analysis to Webber's speech.  This argument is likewise without merit.  A forum

analysis is appropriately applied where the state acts solely in its role as a sovereign. *See*

*generally* Poway Unified, 658 F.3d at 962 (discussing why the Pickering test applies to various

types of public employee speech); *see also* Tucker v. State of Cal. Dept. of Educ., 97 F.3d 1204,

1210 (9th Cir. 1996) ("[T]he [Pickering] Court recognized that 'the State has interests as an

employer in regulating the speech of its employees that differ significantly from those it

possesses in connection with regulation of the speech of the citizenry in general.'") (quotation

omitted).  Thus, where, as here, the state acts as both a sovereign and an employer, Pickering

provides the test for determining whether the state has violated the employee's First Amendment rights.

For the reasons stated above, the court finds that, under <u>Pickering</u>, the defendants have failed to show that Webber's speech actually disrupted or could *reasonably* be predicted to disrupt the workplace or otherwise interfere with the efficiency and integrity of their respective duties. Therefore, as a matter of law, neither the District defendants nor the First Student defendants have established that their legitimate administrative interests outweigh Webber's First Amendment rights.

### 5. Whether First Student would have taken the adverse employment action even absent the protected speech

Having failed to carry its burden at step 4, the government must demonstrate in the alternative that it "'would have reached the same [adverse employment] decision even in the absence of the [employee's] protected conduct.'" <u>Clairmont</u>, 632 F.3d 1091 (citation and quotation omitted). This inquiry "is purely a question of fact" and the court assumes the truth of the plaintiff's allegations. <u>Id</u>. (*quoting* <u>Knickerbocker v. City of Stockton</u>, 81 F.3d 907, 911 (9th Cir.1996)). Webber alleges that he would not have been fired but for his display of the flag and his refusal to remove it. Assuming the truth of these allegations, this issue is not appropriately resolved on summary judgment.

### Conclusion

Webber has borne his burden at each step of the sequential <u>Pickering</u> analysis. Therefore, defendants' motions for summary judgment should be DENIED with regard to Webber's § 1983 claims.

//

//

## II.  Qualified Immunity

Bergreen raises a defense of qualified immunity in response to Webber's § 1983 claim. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, --- U.S. ---, 131 S.Ct. 2074, 2080 (2011) (*citing* Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)).  "[L]ower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." Id.; Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808 (2009).  Federal and state officials are entitled to qualified immunity where "[their] actions do not amount to a constitutional violation, the violation was not clearly established, or their actions reflected a reasonable mistake about what the law requires." Brooks v. Seattle, 599 F.3d 1018, 1022 (9th Cir. 2010).

### A.  Whether Bergreen violated Webber's constitutional right

Where the state acts as both employer and sovereign, First Amendment rights are clearly established.  "[T]he Court applies a distinct Pickering-based analysis that 'reconcile[s] the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission.'" Poway Unified Sch. Dist., 658 F.3d 961 (*quoting* San Diego v. Roe, 543 U.S. 77, 80, 125 S.Ct. 521 (2004)).  The court has found that genuine issues of material fact preclude the determination on summary judgment as to whether Webber's Confederate flag touches on a matter of public concern, and whether the District, through Bergreen, either acted jointly with or compelled First Student to threaten, suspend, and ultimately terminate Webber's employment.  Should Webber prevail on these issues at trial, Webber will have established a violation of his First Amendment rights.  Bergreen is therefore

not entitled to qualified immunity unless Webber's First Amendment rights were not clearly established or a reasonable official in Bergreen's position would have believed that his conduct was lawful.

### B. The right was clearly established

"Whether a right is clearly established turns on the 'objective legal reasonableness of the action, addressed in light of the legal rules that were clearly established at the time it was taken.'" Clouthier v. Cnty. of Contra Costa, 591 F.3d 1232, 1241 (9th Cir. 2010) (*quoting* Pearson, 129 S.Ct. at 822). "This is 'a two-part inquiry: (1) Was the law governing the state official's conduct clearly established? (2) Under that law could a reasonable state official have believed his conduct was lawful?'" Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th Cir. 2002) (*quoting* Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001)). In the context of qualified immunity, the Court determines whether a right was clearly established by looking to "Supreme Court and Ninth Circuit law existing at the time of the alleged act." Cmty. House, Inc. v. Boise, 623 F.3d 945, 967 (9th Cir. 2010). "Whether the right is clearly established in a particular case is judged as of the date of the incident alleged, and is a pure question of law." Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993).

The law governing Webber's First Amendment rights is clearly established. The display of a flag is an act of symbolic expression protected under the First Amendment. *See e.g.*, Spence v. Washington, 418 U.S. 405, 410, 94 S.Ct. 2727 (1974). ("The Court for decades has recognized the communicative connotations of the use of flags. In many of their uses flags are a form of symbolism comprising a primitive but effective way of communicating ideas . . . ,' and 'a short cut from mind to mind.'") (internal citations omitted); Am. Legion Post 7 of Durham v. City of Durham, 239 F.3d 601, 607 (4th Cir. 2001) ("Flags, especially flags of a political sort,

enjoy an honored position in the First Amendment hierarchy."); Erickson, 209 F.Supp.2d at 1138 ("even if plaintiff's flag tag were nothing other than a symbol of the confederate flag, it would be entitled to protection."). Both Supreme Court and Ninth Circuit case law clearly establishes that where a private actor acts under color of state law in depriving a plaintiff of his constitutional rights, the actions of the private actor are attributable to the state. Brentwood, 531 U.S. at 295; Florer, 639 F.3d at 921. Where, as here, the private actor is alleged to have acted under color of state law in imposing restrictions on an employee's private speech, the restrictions imposed violate the employee's First Amendment rights when the government's legitimate administrative interests as an employer do not outweigh the employee's interests in free speech. Eng, 552 F.3d 1070 (*citing* Pickering, 391 U.S. at 568).

As a matter of law, Bergreen could not have believed that he could lawfully demand that Webber's flag be removed because a reasonable official in his position would have known that he could not lawfully enforce the District's anti-harassment policy against Webber either directly or indirectly through First Student. First, Bergreen could not have used the District's policy to compel Webber to remove his flag if he had been a District employee or independent contractor because, as discussed above, under the Pickering analysis there is no evidence that the District's legitimate administrative interests outweigh Webber's First Amendment rights. Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 6847, 116 S.Ct. 2342 (1996) (Pickering analysis applies to restrictions imposed by public employers on the private speech of both public employees and independent contractors); *see also* Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 923 (9th Cir. 2004). Furthermore, under Brentwood and Florer, Bergreen could not compel, coerce, or willfully participate with First Student to accomplish indirectly what he could not accomplish directly against a public employee or independent contractor, as this constitutes "state action."

The District argues Bergreen could have believed that his actions were proper under the highly discretionary <u>Tinker</u> standard. This argument lacks merit. <u>Tinker</u>'s "substantial interference" test applies only to in-school suppression of *student* speech and, moreover, extends only to "viewpoint-based speech restrictions" on "pure" speech. <u>Jacobs v. Clark Cnty. Sch. Dist.</u>, 526 F.3d 419, 430 (9th Cir. 2008); *see also* <u>Poway Unified School Dist.</u>, 658 F.3d at 962-64 (district court erred by evaluating challenge to restriction of teacher's in-school speech under <u>Tinker</u> instead of applying <u>Pickering</u> balancing test). Thus, a reasonable official in Bergreen's position would know that <u>Tinker</u> is inapplicable here because Webber is an employee, not a student, and, as the District itself has pointed out, Webber's flag is expressive activity, not "pure speech."

### Conclusion

In sum, should Webber prove at trial that First Student violated his constitutional rights while acting under color of state law, Bergreen will not be entitled to qualified immunity because Webber's free speech right was clearly established and Bergreen could not reasonably have believed that his actions were lawful. However, should Webber fail to establish a constitutional violation, Bergreen will be entitled to qualified immunity.

## III. State Law Claims

Webber brings his second claim under the Oregon Tort Claims Act ("OTCA"), OR. REV. STAT. § 30.260 *et seq.*, and OR. REV. STAT. § 30.320, alleging violations of article I, section 8 of the Oregon Constitution.

In ruling on the motions to dismiss by the District and First Student, this court recommended that Webber be granted leave to amend his complaint to bring this claim under the OTCA. This was error. The Eleventh Amendment bars citizens from bringing suit in federal

court against a state unless that immunity is waived by the state or abrogated by Congress.

Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54, 116 S.Ct. 1114 (1996); Atascadero State

Hosp. v. Scanlon, 473 U.S. 234, 238, 105 S.Ct. 3142 (1985) *superseded in other respects by*

Civil Rights Remedies Equalization Amendment of 1986, 42 U.S.C. § 2000d–7.  The OTCA

provides a limited waiver of the State of Oregon's sovereign immunity for the torts of its

officers, employees and agents acting within the scope of their employment or duties.  OR. REV.

STAT. § 30.265(1).  It does not waive the State of Oregon's Eleventh Amendment immunity to

suit in federal court.  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99 n. 9, 104 S.Ct.

900 (1984) (a state's general waiver of sovereign immunity in its own courts is not a waiver of

Eleventh Amendment immunity to suit in federal court); Estate of Pond v. Oregon, 322

F.Supp.2d 1161, 1165 (D. Or. 2004) ("The [OTCA] is a waiver of sovereign immunity but does

not waive Eleventh Amendment immunity. Thus, suits by private parties against the state must

be brought in state court."); McVay v. Becker, No. 3:10-CV-1484-AC, 2012 WL 1890374, *9

(D. Or Mar. 21, 2012) (same).  Nor has the State of Oregon unequivocally consented to federal

jurisdiction for claims brought under ORS § 30.320.  Olson v. Or. Univ. Sys. ex. rel. Pernsteiner,

No. CV 09-167-MO, 2009 WL 1270293, *6 (D. Or. May 6, 2009).

Because state sovereign immunity deprives this court of jurisdiction to adjudicate

Webber's claims under the OTCA and ORS § 30.320, Webber's second claim for relief should

be DISMISSED and the motions for summary judgment should be DENIED AS MOOT.

Dismissal is without prejudice to Webber's right to pursue this claim in state court.

## RECOMMENDATION

For the reasons stated above, the motions for summary judgment filed by the First

Student defendants (#28) and the District Defendants (#32) should be DENIED, and Webber's

claims under the OTCA and ORS § 30.320 should be dismissed.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Federal Rule of Appellate Procedure Rule 4(a)(1)  should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *Objections to this Report and Recommendation, if any, are due by August 20, 2012.  If objections are filed, any response to the objections is due by September 6, 2012.  See* FED. R. CIV. P. 72, 6.

DATED this _____ day of August, 2012.

_____
MARK D. CLARKE
United States Magistrate Judge