IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

KENNETH WEBBER,

       Plaintiff,

  v.

FIRST STUDENT, INC., et al.,

       Defendants.

Case No. 1:11-cv-3032-CL

**ORDER**

**PANNER, District Judge:**

    Kenneth Webber was terminated by his employer, First Student, Inc., for insubordination after he refused to remove a 3-by-5 foot Confederate flag from his pickup truck while the truck was parked on property of the Jackson County School District. Webber claims First Student's termination violated his First Amendment rights. He brings this civil rights action against First Student; Jonel Todd, his supervisor at First Student; the Jackson County School District (also known as the Phoenix-Talent School District); and Ben Bergreen, the School District superintendent.

1   - ORDER

Defendants move for summary judgment. Magistrate Judge Mark D. Clarke has filed a Report and Recommendation (R&R) recommending defendants' motions be denied.

Defendants object to the R&R, so I have reviewed this matter de novo. 28 U.S.C. § 636(b)(1)(C); McDonnell Douglas Corp. v. Commodore Bus. Mach., Inc., 656 F. 2d 1309, 1313 (9th Cir. 1981). Because First Student was not acting under color of state law when it terminated Webber, I grant defendants' motions for summary judgment.

## DISCUSSION

### I. Factual Background

First Student, a private employer doing business in about forty states, has a contract with the Jackson County School District to transport students. First Student operates on property it leases from the School District.

Webber worked as a school bus driver for First Student. Starting in 2009, he kept a 3-by-5 foot Confederate flag, emblazoned with the word "Redneck," hanging from an antenna on his pickup truck. Webber parked his truck in First Student's employee parking lot, which is owned by the School District.

There were no complaints about the flag until February 22, 2011, when Bergreen, the School District superintendent, noticed the flag while walking by Webber's truck. Bergreen asked Todd, Webber's supervisor, to remove the flag from District property.

Bergreen states, "I knew the students would see the flag as they traveled to the Future Farmers of America facility behind the

2 - ORDER

bus barn.[1]  The presence of the flag in a location where students could see it would erode the progress the District has made to ease the racial tension within the District and be a detriment to education within the District." Bergreen Decl. ¶ 20.

Bergreen told Todd that the Confederate flag violated School District policy because students had used the flag as a symbol of white supremacy.  As the R&R notes, it is undisputed that the School District has experienced racist incidents, both before and after Webber's termination.  R&R at 25-26.  Several of these incidents have been associated with the Confederate flag, including the flag's use by students identifying with a white supremacist gang called the Crazy White Boys.  R&R at 26.

Todd states, "Bergreen asked me to ask the driver of the truck to take the flag down while parked on District property. . . . . I agreed to ask the driver of the truck to take down the flag.  That driver was plaintiff."  Todd Decl. ¶ 9.

The next day, Todd told Webber that the School District wanted the flag removed from its property.  According to Webber, Todd explained, "Well, [Bergreen] doesn't want people to think that, like, racist people work here or that it has to do with racists."  Guest Decl., Ex. 1, at 6.  Webber replied, "My flag has nothing to do with racism. . . . . So I am not going to take it down because one person has a different thought about it."  Id.

On March 1, 2011, Webber asked Todd to see First Student's

---

[1] Each week, about twenty students in the Future Farmers of America program walked within fifteen feet of the flag.

3 - ORDER

policy prohibiting the display of the Confederate flag. Todd sent Bergreen an email:

> Good afternoon, Do you have a policy in writing that you can send me on the "flag issue" HR tells me if there is a written policy we can get this put to rest. I am tired of arguing with this driver. Thank you!

Boardman Decl., Ex. 5. Bergreen responded to Todd the next day:

> Jonel: Board policy . . . harassment addresses objects that are offensive and demeaning to protected individuals and groups. The Confederate flag is a symbol of many racists [sic] hate groups. The fact that a member of your organization called immediately to complain about my request not to display the flag on school property is disturbing as is the fact I was identified as the person making the request to remove the flag. I would have expected a more professional, proactive and sensitive response from you on the issue.

Id.

Todd responded to Bergreen's email:

> Ben, I sincerely apologize. I did not tell the driver that it was you who asked. I did tell him it was a request from the School District because of a policy and the bus barn is on School District property, and as our client he was to comply. He was one of the drivers that was in the drivers room when you came over. I did wait until the next day to talk to him, and I heard that it had been reported to a TV station. I called him and asked him what was going on. And he told me it was another driver who had called, not him. I do not believe him. I am truly sorry that I did not handle that in a more professional manner.

Id., Ex. 12 at 8.

Todd met again with Webber. Todd told Webber that he would be suspended if he refused to take down the flag. Webber rejected options offered by Todd, such as taking the flag down while the truck was on School District property, parking the truck on a co-worker's property nearby, or rolling up or covering the flag. Webber understood the restriction on displaying the flag applied

4 - ORDER

only when the flag was on School District property.

Todd suspended Webber for one day for refusing to comply with her order. The suspension was reported in the news media.

Van Criddle, First Student's regional operations manager, emailed Bergreen on March 2, 2011:

> I hope that Jonel [Todd] has contacted you regarding the course of action we are taking with regard to the flag person. Our HR department has directed us to have him park the truck out of site [sic] until they could discuss the matter. This morning he was given a direct instruction to remove the flag. He refused to do so. He has been suspended with intent to terminate. He has threatened to contact the media. We have contacted our media department and asked them to make contact with the local media and inform them that we asked him to remove the flag while on our property and he refused so we terminated his employment. We intend to take full responsibility for his termination and not mention the district or district policy at all. I apologize for any issues this has caused the District or you and Doug personally.

Bergreen Decl., Ex. 6B, at 1. The contract between First Student and the School District provides that the School District has no authority over First Student's employment practices, and no power to discharge or discipline First Student's employees. Todd Decl., Ex. 1, at ¶ 21. The contract also provides, "Contractor further agrees that District or its Superintendent shall have the right to require that any specific employee of the Contractor not furnish service to District under this Agreement." Id.

On March 3, 2011, Webber met with Todd and Rowdy Bates, a manager for First Student based in Grants Pass. Bates and Todd suggested that Webber take one of the options Todd had previously offered, such as rolling up the flag while on School District property. Webber testified that he "knew Jonel [Todd] did try to

5 - ORDER

find the solution to it, but all the solutions came up with either taking down or hiding it [or parking off site]." Guest Decl., Ex. 1, at 38. Todd told Webber he would be suspended for three days, and warned that he would be terminated if he continued to disobey her orders.

    On March 4, 2011, Bergreen responded to Todd's email:

> Jonel, in a perfect world when you asked Mr. Webber to take down the flag he would have said yes, and that would have been the end of it. Of course, that is what I was thinking would happen. One thing I will do as much as possible in the future is communicate with you in person, person-to-person, or at least by phone during difficult situations. E-mail especially during times of stress does not work well for me. So I apologize for being abrupt. I didn't realize my request could generate such a huge controversy. I genuinely appreciate the work you do for the District and the great job you do in keeping the transportation system running smoothly. Sorry for the delay in getting back to you and for not being more sensitive to your situation. It has been a challenging week on many fronts.

Smith Decl., Ex. 12 at 10.

    Bergreen emailed Criddle, First Student's regional manager:

> Reactions to the flag issue appear to be on the decrease. The next time we get together, it may be worth it to take some time to analyze how to best deal with difficult issues between our two organizations. I am always looking to profit from going through difficult situations and the lessons to be learned for next time -- if any. I appreciate your support and speedy response to my concerns. Sorry for the delay in getting back to you -- I had several other challenging issues this week as well. Thanks.

Bergreen Decl., Ex. 6B, at 1.

    Criddle replied to Bergreen:

> I would appreciate the opportunity of how to deal with difficult circumstances in the future. I will have let you know when I will be down there next so we can see if we can find a mutually agreeable time to get together.

6 - ORDER

Hope this week is better than last for both of us.
Bergreen Decl., Ex. 6B, at 1.

Webber testified that on March 8, 2011, Todd told him, "Well, I got to ask you again. Are you going to take the flag down?" Guest Decl., Ex. 1, at 43. Webber said, "Nope." Webber understood the options previously offered by First Student were still available to him. Todd told Webber he was terminated for insubordination.

## II. First Student Was Not Acting Under Color of State Law

Plaintiff claims that First Student, a private corporation, violated his First Amendment rights. "But the First Amendment protects individuals only against government, not private, infringements upon free speech rights." George v. Pacific-CSC Work Furlough, 91 F.3d 1227, 1229 (9th Cir. 1996) (per curiam). Webber must show First Student's termination "somehow constitutes state action." Id. He must overcome the presumption that a private actor's conduct is not state action. Florer v. Congregation Pidyon Shevuyim, N.A., 639 F.3d 916, 922 (9th Cir. 2011), cert. denied, 132 S. Ct. 1000 (2012). As the R&R notes, although there may be issues of fact regarding the extent of state involvement, the ultimate determination on state action is a question of law for the court. R&R at 8 (citing Blum v. Yarestsky, 457 U.S. 991, 997 (1982)).

### A. Determining Whether a Private Actor Acts Under Color of State Law

"State action may be found if, though only if, there is such a close nexus between the State and the challenged action that

7  - ORDER

seemingly private behavior may be fairly treated as that of the State itself." Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 955 (9th Cir. 2008) (en banc) (citing Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001)). The Ninth Circuit uses four approaches to determine whether private conduct is attributable to the state: "(1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus." Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003) (quotation omitted). These are "simply factors that may be considered in a flexible approach to state action." Villegas, 541 F.3d at 957 n.4.

### B.  Webber's Termination Was Not Under Color of State Law

#### 1.  The Public Function and Governmental Nexus Tests Do Not Apply

The R&R correctly concludes that neither the public function nor the governmental nexus tests applies here.

#### 2.  There Is No Joint Action

The R&R concludes disputed issues of material fact exist whether Webber's termination was the result of joint action between First Student and the School District. The R&R correctly states there is no evidence of a conspiracy between First Student and the School District. R&R at 14-15. The R&R then concludes, however, that issues of fact exist whether the School District "'has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity.'" R&R at 15 (quoting Collins v. Womancare, 878 F.2d 1145, 1154 (9th Cir. 1989) (R&R

8  - ORDER

omits citation and quotation marks)).

For joint action to exist, there must be willful, joint participation between the state and private actors in which "the state knowingly accepts the benefits derived from unconstitutional behavior." Florer, 639 F.3d at 926 (citations and quotations omitted). "The joint action test is not satisfied absent willful joint participation, . . . where the state was in 'a position of interdependence with the private entity.'" Id. at 927 (citations omitted).

The School District and First Student did not jointly participate in terminating Webber. There is no evidence from which a reasonable jury could find Bergreen, or anyone else from the School District, asked First Student to terminate Webber, or even to discipline him. Under its contract with First Student, the School District had no right to terminate or discipline First Student's employees. Only First Student could do so.

The R&R notes First Student relied on the School District's policy when it required Webber to remove the Confederate flag while his truck parked was on School District property. The School District's policy against the display of demeaning, disruptive symbols did not require Webber's termination. Webber's termination was solely First Student's decision.

The R&R cites Webber's arguments that the School District "used First Student to indirectly violate his First Amendment rights" and "provided the impetus for the constitutional violation and took no action to dissuade First Student from engaging in the

9   - ORDER

course of action effecting that violation." R&R at 16. No reasonable jury could construe the School District's inaction as evidence of joint participation in First Student's termination of Webber.

### 3. There Is No Coercion

"Under the state compulsion approach, a private entity acts as the state when some state law or custom requires a certain course of action." George, 91 F.3d at 1232. As the R&R correctly notes, the facts relevant to the compulsion test are undisputed. R&R at 11-12. I agree with the R&R that there is no "direct evidence that [the School District] caused Webber's termination." R&R at 13. In arguing that the School District coerced First Student into terminating Webber, Webber resorts to speculation and unjustified inferences.

Bergreen asked First Student to remove the Confederate flag from School District property. The exchange of emails shows Bergreen never threatened First Student with any consequences if the flag was not removed, such as canceling the School District's contract with First Student. A reasonable jury could find Bergreen acquiesced in First Student's decision to terminate Webber, but the state's acquiescence in, or even approval of, a private actor's conduct is not coercion. Caviness v. Horizon Community Learning Center, Inc., 590 F.3d 806, 817 (9th Cir. 2010) ("'[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action'") (quoting Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 52 (1999)).

10 - ORDER

The R&R cites the agreement between First Student and the School District, which gives the School District "the right to require that any specific employee of [First Student] not furnish service to District under this Agreement." As the R&R correctly notes, this provision does not allow the School District to terminate or discipline a bus driver employed by First Student, only to require that a particular bus driver not work in the District. The contractual right to preclude a specific employee from providing service to the School District (a right that the School District did not invoke here) does not show the School District compelled First Student to terminate Webber. See George, 91 F.3d at 1231 (terminated employee could not show state action even though the state "retain[ed] the right to dismiss" the employee, because the state had "neither legally regulated nor contractually specified the manner in which [the private actor] disciplines or terminates its own employees").

In a recent decision, the First Circuit concluded there was no state action when a state agency exercised a similar contractual right. Mead v. Independence Ass'n, 684 F.3d 226, 230 (1st Cir. 2012). There, the private employer operated fifteen assisted living facilities under a contract with the state agency. The plaintiff, Mead, was director of all the facilities. After an investigation, the state agency invoked its contractual right to require that the private employer replace Mead as director of one of the facilities. Mead was later terminated by the private employer, based in part on the agency decision.

11 - ORDER

The First Circuit affirmed the dismissal of § 1983 claim because Mead did not allege the state agency ordered that she be "terminated from her employment, which is the essence of Mead's claim. So far as [the agency] was concerned, Mead could have continued to work in some capacity [at the facility], as well as remained in her position as administrator of [the employer's] fourteen other assisted living facilities." Id. The court concluded that the private employer's "choice to fire Mead cannot be 'deemed to be that of the State,' and [the employer] cannot be held accountable for that choice under § 1983." Id. (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)). The same logic applies here.

The R&R also states that "while First Student argues it acted alone in imposing the progressive disciplinary actions against Webber and ultimately terminated his employment, the credibility of this argument is undermined by the fact that First Student was aware of Webber's flag for 18 months and took no action against him until Bergreen's demand." R&R at 13. First Student's inaction until Bergreen complained about the flag shows only that First Student was unaware of the School District policy or of Webber's flag. Once Bergreen brought the School District policy to Todd's attention, First Student attempted to comply with it.

Webber also argues that "Bergreen did not attempt to dissuade or discourage First Student from acting against Webber using the District's policy, but rather expressed his thanks and appreciation and suggested that the parties analyze the situation

12 - ORDER

for 'lessons to be learned for next time.'" R&R at 13. No reasonable jury could find compulsion under these facts. See Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 164 (1978).

Because Webber cannot show his termination was under color of state law, I do not address his claim that the termination violated his First Amendment rights. See George, 91 F.3d at 1230 ("Demonstrating state action is a necessary threshold which George must cross before we can even consider whether Pacific infringed upon his First Amendment rights to free speech.").

## CONCLUSION

Magistrate Judge Clarke's Report and Recommendation (#49) is adopted in part and not adopted in part. Plaintiff's state law claims are dismissed. Defendants' motions for summary judgment (#28, #32) are granted.

IT IS SO ORDERED.

DATED this 26 day of February, 2013.

OWEN M. PANNER
U.S. DISTRICT JUDGE

13- ORDER